UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAURICE SESSUM,

Movant,

-v.-

UNITED STATES OF AMERICA,

Respondent.

18 Civ. 6222 (KPF)
15 Cr. 667-6 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge[1]:

Maurice Sessum brings this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In November 2016, Sessum pleaded guilty to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of wire fraud, in violation of 18 U.S.C. § 1343. This Court sentenced Sessum principally to concurrent terms of 90 months' imprisonment. In his § 2255 motion, Sessum argues that his prior counsel, Herbert Greenman, rendered ineffective assistance by failing to: (i) challenge the Government's characterization of Sessum as a "debt collector"; (ii) conduct an adequate pretrial investigation; (iii) negotiate a suitable plea agreement; and (iv) challenge the Government's standing and the Court's subject matter jurisdiction over his prosecution. Because Sessum has failed to show that his attorney provided ineffective assistance of counsel that prejudiced him in any way, his § 2255 motion is denied.

---

[1]     The Clerk of Court is directed to modify the caption as shown above.

# BACKGROUND[2]

## A. Factual Background

From at least 2010 until February 2015, Sessum was a co-owner, Chief Executive Officer, and President of the Buffalo-based debt collection company Four Star Resolution ("Four Star"), as well as related entities. (PSR ¶ 65). Together with co-owner Travell Thomas, Sessum was responsible for managing Four Star's day-to-day operations, finances, bank accounts, hiring and termination of employees, and solicitation of consumers to collect debts. (*Id.*).

Specifically, Sessum oversaw four debt collection offices operated by Four Star in Buffalo. (PSR ¶ 66). He managed a team of more than a dozen managers, who in turn oversaw dozens of debt collectors. (*Id.*). As owner and president of Four Star, Sessum drafted, approved, and disseminated collection scripts that contained a variety of misrepresentations and instructed his collectors to make those misrepresentations to consumers over the phone. (*Id.* at ¶ 67). Sessum participated in regular management meetings in which he discussed, edited, and approved scripts containing misrepresentations and arranged for those scripts to be disseminated to collectors on the collection floor. (*Id.*).

As part of the scheme, Sessum routinely and falsely inflated the balances of debts owed by consumers in Four Star debt collection software so that Four

---

[2]  Unless otherwise indicated, all docket entries in this Opinion refer to the docket for *United States* v. *Maurice Sessum*, No. 15 Cr. 667-6 (KPF).  The Court refers to Sessum's Presentence Investigation Report, which is maintained in a restricted format at docket entry 356, as "PSR."

Star's debt collectors could collect more money from the victims than the victims actually owed, a practice known within the company as "overbiffing" or "juicing" balances. (PSR ¶ 74). Sessum, with Thomas, also organized "mailing campaigns" that involved the dissemination of false and fraudulent mailers to consumers throughout the United States. (*Id.* at ¶ 78). As Sessum and Thomas knew, the mailers included fake court documents and affidavits — purportedly sent on behalf of courts and government agencies — that falsely threatened the debtors that they would be sued, prosecuted, or otherwise haled into court if they did not repay their debts. (*Id.*). Sessum and Thomas together reviewed and approved the mailers and arranged for their dissemination by mail across the country. (*Id.*).

As an additional part of the scheme, Sessum organized training sessions in which collectors were trained on how to make misrepresentations over the phone to consumers. (PSR ¶ 79). At one of Four Star's collection centers, Sessum arranged for a manager to appear in person to train collectors on the debt collection technique known as "serving," in which collectors call consumers on the phone, pretending to be process servers, and threaten that the debtors will be served with civil or criminal process imminently if they do not repay the debt. (*Id.*). Sessum attended the training sessions. (*Id.*).

Reflective of the culture of fraud at Four Star, Sessum regularly received complaints from the Better Business Bureau, state attorneys general, the Consumer Financial Protection Bureau, and other state and federal law enforcement agencies, as well as lawsuits, regarding Four Star's abusive debt

collection practices.  (PSR ¶ 80).  Sessum and others at Four Star disregarded these complaints and, at times, submitted false and misleading responses to agencies to avoid law enforcement scrutiny.  (*Id.*).

From 2010 through February 2015, Four Star received $31,475,156.96 from consumer victims through payment processors.  (PSR ¶ 82).  Four Star's corporate bank records show that, during this period, consumer payments were diverted to pay certain of Sessum's personal expenses.  (*Id.* at ¶ 83).

## B.    **Procedural Background**

On October 27, 2015, the Government filed a two-count superseding indictment, S4 15 Cr. 667 (the "S4 Indictment") in the Southern District of New York.  (Dkt. #14).  Count One charged conspiracy to commit wire fraud; from at least 2010 through February 2015, in the Southern District of New York and elsewhere, Sessum, Thomas, and at least nine others conspired to make false and fraudulent representations by telephone and email to victims, in order to convince those victims to pay purported debts, including by wire transfer.  (*See* S4 Indictment; PSR ¶ 2).  Count Two charged the substantive offense of wire fraud; from at least 2010 through February 2015, in the Southern District of New York and elsewhere, Sessum, Thomas, and the same individuals charged in Count One engaged in a scheme to make false and fraudulent representations by telephone and email to victims, in order to convince victims to pay purported debts, including by wire transfer.  (*See* S4 Indictment; PSR ¶ 3).

Sessum was arrested in the Western District of New York on the same day that the S4 Indictment was filed. (Dkt. #27). On November 6, 2015, Sessum and his co-defendants were arraigned on the S4 Indictment in the Southern District of New York. (Dkt. #86 (transcript)). At the arraignment, Sessum was represented by Herbert Greenman, who continued to represent him throughout his criminal proceedings. (*See generally* Dkt.).

On November 20, 2015, co-defendant Travell Thomas moved to transfer venue to the Western District of New York. (Dkt. #63). All of the other defendants, including Sessum, joined in the motion. (Dkt. #542 (transcript) at 9:1-4; s*ee* Dkt. #65, 67, 69, 70, 85, 89, 110, 111, 136). The Government opposed the motion in a brief filed on December 15, 2015. (Dkt. #79). The Court held oral argument on the motion on February 11, 2016. (Dkt. #546 (transcript)). On February 25, 2016, the Court denied the motion to transfer venue. (*See* Dkt. #136).

On June 17, 2016, the Court set a schedule for the filing of any pretrial motions. (Dkt. #188, 189). On July 19, 2016, Sessum filed an omnibus brief seeking to, *inter alia*, exclude certain statements made by Sessum and statements made by non-testifying co-conspirators; moving for a bill of particulars, the revelation of the identity of informants, discovery pursuant to Fed. R. Crim. P. 16, disclosure of Jencks Act material, disclosure of *Brady* material, disclosure of evidence pursuant to Fed. R. Evid. 404, 608, and 609, disclosure of witness statements, preservation of notes and other evidence, disclosure of grand jury transcripts; and further moving for *voir dire* of the

Government experts outside the presence of the jury, an audibility hearing, suppression of evidence seized pursuant to a search warrant, deletion of certain language from the S4 Indictment, and severance of Sessum's trial. (Dkt. #207). On August 5, 2016, the Government filed a brief opposing all forms of relief sought by Sessum. (*See* Dkt. #226). The Court held oral argument on the motions on August 22, 2016 (*see* Dkt. #284 (transcript)), and then denied the motions (*see* Dkt. #238).

Trial in the matter was scheduled to begin on December 5, 2016. (Dkt. #189). By November 1, 2016, Sessum was the only defendant scheduled to proceed to trial. To that end, on November 9, 2016, Sessum filed an omnibus motion *in limine* (Dkt. #296), and proposed both *voir dire* questions (Dkt. #297), and a proposed jury charge (Dkt. #301). On November 17, 2016, Sessum appeared before the Court for a change of plea hearing. (*See* Transcript of Plea Proceedings of 11/17/2016 ("Plea Tr." (Dkt. #334))). Sessum was represented by Greenman at his plea hearing (Plea Tr. 2), and pleaded guilty pursuant to a written plea agreement with the Government (the "Plea Agreement") (*see id.* at 21:6-19).

At his plea hearing, the Court found that Sessum was competent to plead guilty. (Plea Tr. 7:17-22). The Court confirmed that Sessum had reviewed the S4 Indictment (*id.* at 7:23-8:4); discussed the charges (and any defenses he had to them) with his attorney (*id.* at 8:5-9); discussed with his attorney the consequences of entering a guilty plea (*id.* at 8:10-14); and was satisfied with his attorney's representation of him (*id.* at 8:15-17). The Court

then reviewed with Sessum the rights he would give up by pleading guilty. (*See id.* at 8:18-13:10).

The Court ensured that Sessum understood the elements of wire fraud and of conspiracy to commit wire fraud. (Plea Tr. 13:11-15:14). Then, the Court explained the maximum possible penalties as followed:

> What I'd like to do, then, sir, is to talk about the penalties that are associated with these two offenses, and I'm going to talk about the maximum penalties that are associated w[ith] these two offenses. I'm using the term "maximum" deliberately, sir, because I mean to suggest to you this is the most that could possibly be imposed.
>
> That is not to say, sir, that this is what you're going to receive, but I do need to make sure that you understand that, by pleading guilty, you're subjecting yourself to the possibility of receiving any combination of punishments up to the statutory maximum terms that I'm about to describe.

(*Id.* at 15:15-25). The Court confirmed that Sessum understood this: that the "maximum term of imprisonment for each of these offenses, is 20 years' imprisonment" and that "the maximum term of imprisonment is 40 years' imprisonment." (*Id.* at 16:3-9).

The Court also ensured that Sessum had discussed the United States Sentencing Guidelines (the "Guidelines") with his attorney and that he understood his sentence would ultimately be up to the Court. (Plea Tr. 19:7-20:15). The Court stated explicitly to Sessum that:

> [E]ven if your ultimate sentence is different from what your attorney, or anyone else, might have suggested to you it could be, and even if it is different from what you expected or hoped for, and even if it is different from any range that might be contained in any agreement that

> you have with the government, you would still be bound
> by your guilty plea.
>
> And what I mean by that, sir, is you would not be
> permitted to withdraw your guilty plea based simply on
> your dissatisfaction with your sentence.

(*Id.* at 20:16-25).

The Court then reviewed several provisions of the Plea Agreement with Sessum. (*See* Plea Tr. 21:3-26:22). The Court confirmed that Sessum had read and understood the Plea Agreement and had spoken about it with Greenman. (*Id.* at 22:1-7). In the Plea Agreement, Sessum stipulated with the Government to a Guidelines range of 151 to 188 months' imprisonment (the "Stipulated Guidelines Range"). (*See* Plea Agreement 3; Plea Tr. 24:17-24). Sessum further agreed to waive any right to appeal or collaterally attack a sentence within or below the Stipulated Guidelines Range, except to the extent the claims were based on ineffective assistance of counsel. (Plea Agreement 4-5; Plea Tr. 24:10-25:4).

Sessum then allocuted to the conduct underlying Counts One and Two as follows:

> From 2010 through 2015, I was an owner and held
> executive positions with Four Star Resolution and
> related companies. During that time, I agreed with
> others at Four Star that the debt collectors at the
> company would fraudulently collect debts making
> misrepresentations to debtors over the phone.
>
> The misrepresentations included, among others, the
> debtors would be served with process, to be brought
> into court if they did not repay the debt. I agreed with
> others and knew that the balances of some of the debts
> that were being collected was being falsely inflated in
> phone calls with debtors.

> I understood that the conduct involved phone calls, e-mails, wire transfers of money, and I knew that what they were doing was wrong and illegal.

(Plea Tr. 28:2-16). At the conclusion of the proceeding, the Court accepted Sessum's plea of guilty to Counts One and Two. (*Id.* at 34:15-23).

Sessum appeared before the Court for his sentencing on July 7, 2017. (*See* Transcript of Sentencing Proceedings of 7/7/2017 ("Sent. Tr." (Dkt. #462))). The Court calculated Sessum's Guidelines range to be 151 to 188 months' imprisonment, affording him a two-level reduction for acceptance of responsibility. (*Id.* at 51:10-15). The Government sought a Guidelines sentence (*see id.* at 31:21-32:3), and Sessum argued for a below-Guidelines sentence (*see id.* at 26:20-27:9). The Court agreed in part with the contention of Sessum's counsel that the Court should "question whether loss is an effective proxy for culpability under the guidelines." (*Id.* at 55:6-11). After considering the parties' arguments, the Court varied downward substantially and imposed concurrent terms of 90 months' imprisonment on Counts One and Two. (*Id.* at 55:18-21).

The written judgment was entered on July 12, 2017. (Dkt. #402). On July 19, 2017, Sessum filed a notice of appeal with the United States Court of Appeals for the Second Circuit. (Dkt. #403). On July 19, 2017, Sessum moved to withdraw his appeal. (*United States* v. *Sessum*, No. 17-2254, Dkt. #87 (2d Cir. July 19, 2017)). On January 19, 2018, the Second Circuit issued an order granting the motion to withdraw the appeal. (*Id.* at Dkt. #91 (2d Cir. Jan. 19, 2018)).

On June 19, 2018, the Court received a submission from attorney Bret Williams, who had entered a notice of appearance on the record as counsel for Sessum; the submission was styled as a motion to vacate Sessum's conviction and sentence pursuant to 28 U.S.C. § 2255. (Dkt. #494). Thereafter, on July 9, 2018, Sessum, appearing *pro se*, filed with the Court a "motion for leave to amend" his counseled § 2255 motion, stating that his attorney had filed the initial § 2255 motion "[a]gainst his wishes" and without additional grounds for relief that Sessum intended to pursue. (Dkt. #503). The *pro se* motion resulted in the initiation of a new civil matter bearing the docket number 18 Civ. 6222. In that civil action, Sessum also filed a "motion to relieve counsel and proceed *pro se* in habeas corpus proceedings." (*Sessum* v. *United States*, 18 Civ. 6222 (KPF), Dkt. #2 (S.D.N.Y. July 9, 2018)).

On July 13, 2018, the Court issued an order stating that it would not permit hybrid representation, and that Sessum's counsel should indicate whether he would continue to represent Sessum. (Dkt. #506). On July 15, 2018, the Court received a letter from Williams seeking to be relieved as counsel. (Dkt. #507). On July 16, 2018, the Court terminated Williams as counsel and granted Sessum an extension of time to file his memorandum of law in support of his motion to vacate or set aside his conviction and sentence. (Dkt. #510).

On September 18, 2018, Sessum filed his § 2255 submission. (Dkt. #524). The submission consisted of a motion for leave to adopt a subject matter jurisdiction argument made by co-defendant Travell Thomas in his

§ 2255 motion, as well as motion Thomas had made to expand the record.  (*See id.* at 1-3).  Sessum also submitted an affidavit in which he averred that:

> Had I known that: (1) my characterization as a defaulted debt purchaser was legally different tha[n] a debt collector and subject to different laws; (2) that my loss amount would be different based on debts recovered without even calling anyone (i.e. no misrepresentations); (3) that nobody ever received a 20 year sentence for debt collection; (4) that others charged with debt collections violations only received civil sanctions, I would have not pled guilty and would have proceeded to trial and maintained all of my appellate rights.

(*Id.* at 5-6 ("Sessum Aff.") ¶ 6).  Sessum's submission also contained a brief that laid out two grounds in support of his argument that his prior counsel had been ineffective: (i) counsel had rendered ineffective assistance during the plea negotiation process, which rendered his plea not knowing and voluntary (*id.* at 7-30 ("Sessum Br.") 7-15); and (ii) counsel had failed to perform the proper pretrial investigation, which would have exposed fatal flaws in the S4 Indictment and significantly reduced the loss amount for Guidelines purposes (*id.* at 15-22).  On January 3, 2019, Sessum filed an attorney-client privilege waiver form.  (Dkt. #537).  On March 13, 2019, Greenman filed an affidavit in response to Sessum's motion charging him with ineffective assistance.  (Dkt. #557 ("Greenman Aff.")).  The Government filed a brief in opposition to Sessum's motion on April 11, 2019.  (No. 18 Civ. 6222, Dkt. #26 (S.D.N.Y. Apr. 11, 2019)).

**DISCUSSION**

**A.     Applicable Law**

**1.     Motions Under § 2255**

Because Sessum is a *pro se* movant, his submission has been evaluated using "less stringent standards than formal pleadings drafted by lawyers." *Ferran* v. *Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (internal citation omitted).  The Court has construed Sessum's submissions "liberally and interpret[ed] them to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted).

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  However, the grounds for such a collateral attack under § 2255 are much more limited than those available on a direct appeal.  *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun,* 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

12

## 2. Developing the Record in § 2255 Motions

In ruling on a motion under 28 U.S.C. § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also, e.g., Pham* v. *United States*, 317 F.3d 178, 185 (2d Cir. 2003) (noting that 28 U.S.C. § 2255 does not permit summary dismissals of motions that present facially valid claims). That said, the filing of a § 2255 motion does not automatically entitle the movant to a hearing, as, for example, in instances in which a movant's allegations are "vague, conclusory, or palpably incredible." *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962). Rather, it is within the district court's discretion to determine the scope and nature of a hearing. *Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir. 2001) ("It was, therefore, within the district court's discretion to choose a middle road that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing."). It is also within the district court's discretion to determine whether to hold a hearing, or to elect to investigate facts outside the record without the personal presence of the movant. *See Machibroda*, 368 U.S. at 495; *see also, e.g., Chang*, 250 F.3d at 85-86 (finding that it was within the district court's discretion to rely on "a detailed affidavit from trial counsel" instead of conducting a full hearing).

To warrant a hearing, the movant "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez* v. *United States*, 722 F.3d 118, 131 (2d Cir. 2013). In this regard, "[t]he procedure for determining whether a hearing is necessary is in part analogous to ... a summary judgment proceeding.... If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made." *Puglisi* v. *United States*, 586 F.3d 209, 213 (2d Cir. 2009). A court need not, however, credit factual assertions contradicted by evidence in the record of the underlying proceeding. *Id.* at 213-14. Moreover, "when the judge who tried the underlying proceedings also presides over a § 2255 motion, a full-blown evidentiary hearing may not be necessary." *Raysor* v. *United States*, 647 F.3d 491, 494 (2d Cir. 2011) (citing *Puglisi*, 586 F.3d at 214-15).

In determining whether the assertions in a § 2255 motion warrant discovery or a hearing, the court must take into account admissions made by the defendant at his plea hearing, for "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.*

Ultimately, if it "plainly appears" from the motion, exhibits, and record of prior proceedings that the habeas movant is not entitled to relief, "the judge

must dismiss the motion."  Rule 4(b), Rules Governing Section 2255 Proceedings.

### 3.     Ineffectiveness Claims on Collateral Review

One potential basis for relief under § 2255 occurs when a defendant has received the ineffective assistance of counsel.  A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings; this includes pretrial investigation, *see, e.g., Strickland* v. *Washington*, 466 U.S. 668, 690-91 (1984); entry of a guilty plea, *see, e.g., Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985); and sentencing, *see, e.g., Glover* v. *United States*, 531 U.S. 198, 202-04 (2001).

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland*, 466 U.S. at 687.  *First*, the movant must show that his counsel's representation was deficient, falling below the objective standard of reasonableness.  *See id*. at 687-88.  During this first step, the standard of review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  The Second Circuit has made clear that an attorney does not provide ineffective assistance by failing to raise frivolous arguments, even where requested by a client.  *See, e.g., Weingarten* v. *United States*, 865 F.3d 48, 53 (2d Cir. 2017).

*Second*, the movant must establish that his counsel's errors resulted in actual prejudice.  *See Strickland*, 466 U.S. at 694.  A movant satisfies this second prong by proving that "there is a reasonable probability that, but for

15

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* In the specific context of guilty pleas, the prejudice analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

A court is not required to conduct a *Strickland* inquiry in any particular order. *See Strickland*, 466 U.S. at 697. If the defendant does not successfully establish either the performance prong *or* the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot. *See id.*

## B. Sessum's Prior Counsel Did Not Render Ineffective Assistance

### 1. The Court Had Jurisdiction Over Sessum's Criminal Case

At the outset, Sessum adopts an argument made by Travell Thomas in his § 2255 motion, to the effect that the Court did not have subject matter jurisdiction to adjudicate his case. In his § 2255 motion, Thomas argued that Court lacked subject matter jurisdiction because the Government had failed to establish standing under the standard set out in *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992).

The Court rejects this argument, as it does in denying Thomas's § 2255 motion. (Dkt. #574). Thomas (and now Sessum) sought to import the elements of constitutional standing, discussed at length in civil cases, into the context of a criminal prosecution. But, as the Court explained in deciding Thomas's

§ 2255 motion, these are not the elements that courts consider in assessing whether the Government has standing to bring, or whether a court has jurisdiction to preside over, a criminal case.  Rather, courts have long recognized "the special status of criminal prosecutions in our system."  *Linda R.S.* v. *Richard D.*, 410 U.S. 614, 619 (1973).

The Court's jurisdiction over Sessum's wire fraud prosecution stems from 18 U.S.C. § 3231, which states that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  And the wire fraud statute was properly enacted as a valid extension of Congressional authority granted by the Commerce Clause, as wires are channels or instrumentalities of interstate commerce.  *See United States* v. *Jinian*, 725 F.3d 954, 968 (9th Cir. 2013); *United States* v. *Hook*, 195 F.3d 299, 310 (7th Cir. 1999).

Further, the United States Attorney's Office for the Southern District of New York was a proper party to bring this suit on behalf of the United States. The Office of the United States Attorney was created by the Judiciary Act of 1789, which provided for the appointment "in each district of a meet person learned in the law to act as attorney for the United States … whose duty it shall be to prosecute in each district all delinquents for crimes and offenses, recognizable under the authority of the United States, and all civil actions in which the United States shall be concerned[.]"  Judiciary Act of 1789, 1 Stat. 92.  Today, as in 1789, the United States Attorney for each judicial district retains, among other responsibilities, the duty to "prosecute for all offenses

against the United States." 28 U.S.C. § 547(1). Accordingly, the instant case was properly prosecuted by the Office of the United States Attorney for the Southern District of New York to redress injury to the United States caused by Sessum's criminal conduct occurring in this District. *See* Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act,* 57 U. Chi. L. Rev. 543, 569 (Spring, 1990) ("The government certainly has standing in criminal cases[.]").

As a further point, several courts, in thorough and persuasive analyses, have rejected the argument initially raised by Thomas, and now adopted by Sessum, that the elements of constitutional standing articulated in civil cases need be proven in criminal cases. As the court thoughtfully explained in *United States* v. *Ellis*, No. 06 Cr. 390 (DSC), 2007 WL 2028908, at *1 (W.D. Pa. July 12, 2007):

> [T]o the extent *pro se* defendant has requested and intends to request [the] services [of a paralegal or investigator] to aid him in presenting a motion to dismiss based on this court's Article III jurisdiction to hear the case and the United States Attorney for the Western District's "standing" to conduct the prosecution, the motion must be denied because it is based on indisputably meritless legal theory. Although *pro se* defendant has latched on to the notion that to have standing in an Article III civil controversy, the party bringing the action must have a concrete stake in the litigation and have suffered an injury-in-fact, he fails to appreciate the distinctions to be drawn between a criminal case and a civil controversy. And while the broad language appearing in some of the more recent Supreme Court opinions expounding on the limitations of Article III standing would appear at first brush to be irreconcilable with the traditional mechanics employed in conducting criminal prosecutions, dogmatically

drawing a corollary conclusion that federal criminal prosecution is outside the jurisdictional reach of Article III is tantamount to the "absurd." *See* Edward Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine is Looking for Answers in all the Wrong Places*, 97 Mich. L. Rev. 2239 (1999) (to reason and conclude from the current status of the Court's Article III standing doctrine that "the vast majority of federal criminal prosecutions are not 'cases' or 'controversies' and the United States lacks standing to initiate them [would,] ... [o]f course, [amount to] an absurd result."). Furthermore, while there are several approaches that might be employed to harmonize the seemingly inconsistent principles present in federal criminal prosecutions with the Court's current approach to defining the outer scope of private causes of action challenging the actions of government officials under Article III, we need not delve into that foray to discard the notion that defendant may not be prosecuted by the Justice Department for violation of federal law on the junk pile of needless intellectual exercises in futility. *See id.* (noting that "Article III cannot sensibly be read to prohibit the United States from vindicating its sovereign interests in its own courts" and summarizing the various scholarly approaches that have been used to reconcile federal criminal prosecutions with the Court's current standing jurisprudence).

And in *Rice* v. *Farley*, No. 14 Civ. 31 (ART), 2014 WL 2441260 (E.D. Ky. May 30, 2014), the court resolved an argument identical to Sessum's and Thomas's as follows:

[I]t is the United States' interest — the people's injury at large — that supports criminal standing. But that just begs a most interesting question: after all, why *does* the United States have standing to bring a criminal action when the same generalized interest in enforcing the law does not support standing for private parties, *see, e.g., Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)?

19

As it turns out, Rice has touched on a well-known (seemingly apparent) tension between criminal prosecution and standing doctrine. Indeed, legal academics attacking that doctrine have actually posed the exact same question about criminal standing as that raised by Rice. *See, e.g.,* Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show That Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2246 (1999) ("What is the 'concrete and particularized' injury in fact suffered by the United States that gives it standing to bring a criminal prosecution?"). Unlike Rice, however, these scholars mean not to question the United States' standing in criminal cases, but to rely on that standing to disprove Rice's assumption: precisely because the government unquestionably has criminal standing, they say, particularized injury cannot possibly be required by Article III. Since criminal actions only involve the public's generalized interest in enforcing the law, the argument goes, individualized injury must not be constitutionally required to create a "case or controversy." *Id.* at 2246-51.

This attack on standing doctrine and Rice's challenge to his sentencing court's jurisdiction both fail for the same reason: the constitutional requirements of standing are "party-specific." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 695 (2004). While individualized injury is necessary for private plaintiffs to have standing in private litigation, "diffuse injuries to the general public" are enough to create standing between the public (the government) and criminal defendants. *Id.*; *see also* Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U. Chi. L. Rev. 543, 570 (1990) ("The government enjoys ... a special constitutional status as plaintiff — it sues, for example, to enforce the criminal laws, and it need not show a particularized injury as a predicate to sue."). The Supreme Court put the point quite clearly over a century ago, disavowing that the government needed a concrete interest to establish its standing to sue on behalf of the public:

> Every government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general

welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.

*In re Debs*, 158 U.S. 564, 584, 15 S. Ct. 900, 39 L. Ed. 1092 (1895) (emphasis added) *disapproved of on other grounds by Bloom* v. *State of Ill.*, 391 U.S. 194, 195-96, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968); *see also Alfred L. Snapp & Son, Inc.* v. *Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) (recognizing the sovereign's interest in "creat[ing] and enforce[ing] a legal code, both civil and criminal"). It thus made perfect sense for Chief Justice John Marshall in *Cohens* v. *Virginia* to refer to an action by a state to enforce its penal laws as a "case." 19 U.S. (6 Wheat.) 264, 399, 5 L. Ed. 257 (1821); *see also* John Harrison, *The Power of Congress to Limit the Jurisdiction of Federal Courts and the Text of Article III*, 64 U. Chi. L. Rev. 203, 210 (1997) ("Cases include all legal actions, criminal and civil, while controversies include only civil proceedings."). The key to understanding standing doctrine thus lies in the oft-forgotten distinction between public and private rights.

So while there is no doubt whatsoever that the United States had standing to pursue a criminal action against Rice — and therefore, that the district court had jurisdiction in his case — that universally accepted conclusion is hardly inconsistent with the constitutional requirement of a concrete, individualized interest in private litigation. Standing is no more than the litigable interest necessary to create a case, and when it comes to the government, wrongs to the public at large — generalized grievances — will do. And that makes perfect sense, since the government represents us all. It is thus entirely natural that the United States, but no one individually, can vindicate the people's general interest in respect for the law. *Cf.* Lillian BeVier & John Harrison, *The State Action Principle and Its*

> *Critics*, 96 Va. L. Rev. 1767, 1785 (2010) ("[P]rivate
> individuals are principals, entitled to act to pursue their
> own interests, whereas government decisionmakers are
> agents, whose function is to further the interests of the
> citizens.").

*Id.* at *2-3.

The Court agrees with the reasoning of these two cases and a host of others that have concluded similarly. *See also Amezquita* v. *United States*, No. 19 Civ. 1856 (CCC), 2019 U.S. Dist. LEXIS 160219, at *2 (D.P.R. Sept. 13, 2019) (concluding that United States had Article III standing to prosecute the petitioner); *United States* v. *Rinaldi*, Nos. 3:18 Cr. 279, 3:18 Cr. 280 (RDM), 2019 U.S. Dist. LEXIS 217581, at *4-11 (M.D. Pa. Dec. 18, 2019) (relying on *Ellis* to deny the defendant's motion to dismiss the indictment on the grounds that the prosecution did not present a case or controversy before the court and that the United States lacked standing to bring the prosecution); *United States* v. *Hakim*, No. 1:18 Cr. 126 (MLB) (AJB), 2018 WL 6184796, at *9 (N.D. Ga. Aug. 22, 2018) ("In any event, the Government has standing to prosecute this action."); *United States* v. *Girod*, No. 5:15 Cr. 87 (DCR), 2016 U.S. Dist. LEXIS 82365, at *6-7 (E.D. Ky. June 24, 2016) ("Girod claims that there can be no standing because there are no victims of his conduct. However, the defendant incorrectly assumes that the victims must be identified. Further, diffuse injuries to the general public and potential injuries are sufficient to create standing for criminal prosecution." (internal quotation marks and citations omitted); *United States* v. *Owens*, No. 5:13 Cr. 123 (KKC), 2014 WL 2600082, at *1 (E.D. Ky. June 10, 2014) ("To the extent that Owens is arguing that the

government has no standing to prosecute him because the government has not been injured by the acts alleged in the indictment, 'the Government doubtlessly suffers an 'injury in fact' when a defendant violates its criminal laws.'" (quoting *United States* v. *Yarbrough*, 452 F. App'x 186, 189 (3d Cir. 2011) (unpublished decision)); *Sierra Club* v. *Two Elk Generation Partners, L.P.*, 646 F.3d 1258, 1277 n.8 (10th Cir. 2011) ("When the federal government or one of its agencies brings suit, its standing is usually based on its power, defined by Congress, to redress violations of the laws of the United States. This may be in tension with courts' current understanding of Article III standing, but it is nonetheless axiomatic."); *United States* v. *Ulloa*, No. 1:10 Cr. 321 (TJM), 2011 WL 13128610, at *5 (N.D.N.Y. May 13, 2011) ("Defendant's challenges to the authority of the Court, and the standing and authority of the United States Attorney's Office for the Northern District of New York to prosecute the case, are frivolous."); *United States* v. *Daniels*, 48 F. App'x 409, 417-18 (3d Cir. 2002) (unpublished decision) ("Appellant finally argues that the United States lacks standing to bring a criminal action against him in federal court because the indictment fails to present a 'case' or 'controversy' as required by Article III, Section 2 of the Constitution .... This contention is frivolous. As sovereign, the United States has standing to prosecute violations of valid criminal statutes."). Accordingly, the Court rejects Sessum's and Thomas's argument that the Government lacked standing to prosecute them for wire fraud.

## 2. Sessum's Counsel Was Not Ineffective in His Pretrial Investigation

Sessum also advances several claims specific to his prosecution. He contends, for instance, that Attorney Greenman did not conduct a proper investigation into evidence confiscated by the Government and did not conduct an adequate investigation of the relevant case law. (Sessum Br. 9). Because of these failures, Sessum claims that Greenman's advice for Sessum to plead guilty fell below an objective standard of reasonableness. (*Id.*).

As a preliminary matter, Sessum is correct that a defendant is entitled to the effective assistance of counsel in connection with plea negotiations. *See Lafler* v. *Cooper*, 566 U.S. 156, 162-63 (2012); *Purdy* v. *United States*, 208 F.3d 41, 44-45 (2d Cir. 2000). In this regard, counsel must communicate to the defendant the terms of the plea offer and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed. *Purdy*, 208 F.3d at 45; *see generally Missouri* v. *Frye*, 566 U.S. 134, 144-46 (2012) (stating that defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused); *Davis* v. *Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) ("[C]ounsel has a professional obligation to adequately inform [his] client about the considerations that are relevant to [his] client's decision to accept or deny a plea bargain."); *Pham*, 317 F.3d at 182 (noting that defense attorneys have "a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government"). An attorney's

failure to communicate a plea offer to his client, or to provide objectively reasonable advice about the decision to plead guilty, may amount to constitutionally deficient performance. *See, e.g.*, *Cullen* v. *United States*, 194 F.3d 401, 404 (2d Cir. 1999); *United States* v. *Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Boria* v. *Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996).

Sessum contends that, had Greenman conducted a thorough and proper investigation into the facts of the case, he would have learned that Sessum was not a "debt collector" but, rather, a "defaulted debt purchaser." (*See* Sessum Br. 9-10, 13). Sessum draws a distinction between a defaulted debt purchaser, who purchases debt from debt brokers and legitimately owns the debt he tries to collect on, and debt collectors who work to collect debts owed to others. (*See id.*). Sessum cites *Henson* v. *Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017), in support of his argument regarding this distinction. (*See id.*).

In *Santander*, the Supreme Court considered the term "debt collector" in the Fair Debt Collection Practices Act (the "FDPCA"), 15 U.S.C. § 1692. The FDCPA defines the term "debt collector" as anyone who "regularly collects or attempts to collect ... debts owed or due ... another." 137 S. Ct. at 1721 (quoting 15 U.S.C. § 1692a(6)). In *Santander*, both sides agreed that the term included third-party debt collection agents, and that it did not include those who seek to collect for themselves on loans they originated. *Id.* The Court confronted the issue between these two poles, namely, whether someone who purchases a debt and then tries to collect it for himself is a "debt collector" within the meaning of the FDCPA. *Id.*

The Supreme Court phrased the question as follows: "Does the [FDCPA] treat the debt purchaser in that scenario more like the repo man or the loan originator?"  137 S. Ct. at 1721.  It answered the question "with a careful examination of the statutory text," which "seem[ed] to focus [the Court's] attention on third party collection agents working for a debt owner — not on a debt owner seeking to collect debts for itself."  *Id.*  The Court reasoned as follows:

> [The] language [of the FDCPA does not] appear to suggest that [the Court] should care how a debt owner came to be a debt owner — whether the owner originated the debt or came by it only through a later purchase.  All that matters is whether the target of the lawsuit regularly seeks to collect debts for its own account or does so for "another."  And given that, it would seem like a debt purchaser … may indeed collect debts for its own account without triggering the statutory definition in dispute ….

*Id.* at 1721-22.  Accordingly, to the extent that Thomas contends he did not fall within the definition of "debt collector" as defined in the FDCPA because he owned the debt he collected on, and was not collecting the debts for "another," he is correct.

Sessum's argument, however, seeks to build on that definition.  Sessum claims that because of *Santander,* his counsel was ineffective in failing to challenge the Government's classification of him as a "debt collector," and in permitting him to plead guilty.  (Sessum Br. 10-11).  But Sessum misconstrues the implications of *Santander* and the requirements for a wire fraud prosecution.  The wire fraud statute criminalizes "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by

means of false or fraudulent pretenses, representations, or promises, transmit[ted] or cause[d] to be transmitted by means of wire ... in interstate or foreign commerce[.]" 18 U.S.C. § 1343. Accordingly, the elements of a mail or wire fraud violation are: (i) a scheme to defraud; (ii) money or property as the object of the scheme; and (iii) use of the mails or wires to further the scheme. *Fountain* v. *United States*, 357 F.3d 250, 255 (2d Cir. 2004).

The S4 Indictment alleges that Sessum conspired to make, made, willfully caused others to make, and aided and abetted others in making material misrepresentations and omissions using interstate wires in order to induce individuals to repay debts, including payments made using interstate wires. Sessum allocuted that he "fraudulently collect[ed] debts [by] making misrepresentations to debtors over the phone," and, further, that the "misrepresentations included, among others, the debtors would be served with process, to be brought into court if they did not repay the debt." (Plea Tr. 28:2-16). The crux of the matter is that Sessum and his co-defendants lied, by means of wire, to debtors to collect on the debts. That is all that is required for a wire fraud prosecution.[3] Whether Sessum owned the debts or not is legally irrelevant. Sessum admits that Greenman explained as much to him — telling him that "it didn't matter that [Sessum] bought the debt because the

---

[3] Similarly, Sessum's contention that he charged only industry standard rates on the debt is irrelevant. (*See* Sessum Br. 18). It was the methods and means by which Sessum and his co-defendants attempted to and indeed did collect on debts that rendered their conduct illegal.

misrepresentations made to debtor rendered those borrowers 'victims' and him guilty of conspiracy to commit bank fraud." (Sessum Br. 5).

Accordingly, Sessum has not shown that his counsel was ineffective in failing to challenge the Government's description of Sessum as a "debt collector" or in failing to object to Sessum's prosecution under the wire fraud statute. *See, e.g., Weingarten*, 865 F.3d at 53 (counsel is not ineffective in failing to raise frivolous arguments).

### 3. Sessum's Counsel Was Not Ineffective During the Plea Negotiation Process

Sessum's next argument is that his "[c]ounsel rendered ineffective assistance during the plea bargaining process which rendered his plea <u>not</u> knowing and voluntary." (Sessum Br. 7 (emphasis in original)). Sessum claims the Plea Agreement was one-sided and contained no *quid pro quo.* (*Id.* at 11). He complains that the Plea Agreement contained a provision in which the Government reserved its right to recharge Sessum if his sentence or conviction was vacated, and it did not foreclose the possibility of his future prosecution for criminal tax violations. (*Id.*). Sessum claims that, because the Plea Agreement did not include the phrase "in exchange for," his counsel must have been defective. (*Id.*). Further, he claims that even though the Plea Agreement recited that the maximum term of imprisonment for Counts One and Two is 40 years, pursuant to 18 U.S.C. § 3584, the maximum term is actually 20 years. (*Id.* at 12).

In making the argument that the Plea Agreement was one-sided, Sessum ignores the fact that the Plea Agreement stated that:

> Assuming the defendant clearly demonstrates
> acceptance of responsibility to the satisfaction of the
> Government, through his allocution and subsequent
> conduct prior to the imposition of sentence, a 2-level
> reduction will be warranted, pursuant to U.S.S.G.
> 3E1.1(a).

(Plea Agreement 3). Accordingly, despite Sessum's contention, he *did* receive a benefit from the Plea Agreement. The Government consented to a two-level acceptance of responsibility reduction in his offense level in exchange for his acceptance of responsibility and timely plea. Further, by pleading guilty pursuant to the Plea Agreement, Sessum locked the Government into the Stipulated Guidelines Range, which could have been raised had Sessum gone to trial. And by pleading guilty pursuant to the Plea Agreement, Sessum was able to be sentenced on a cold factual record, without a lengthy trial replete with numerous sympathetic victims.

Sessum complains about several provisions of the Plea Agreement, stating that the Plea Agreement did not foreclose the possibility of his future prosecution for criminal tax violations; that the Plea Agreement did not permit Sessum to request a downward departure from the Stipulated Guidelines Range; and that the Government would be permitted to recharge Sessum if his conviction was vacated. (*See* Sessum Br. 11).[4] These are standard provisions that are contained in the vast majority of plea agreements that the Court sees.

---

[4] The Court observes in passing that the first and third of these challenges presuppose a future criminal conviction. Sessum also complains that the Plea Agreement did not contain the words "in exchange for." (Sessum Br. 11, 14). That the Plea Agreement did not contain these magic words does nothing for Sessum's claim that his attorney provided ineffective assistance. A plea agreement, like any other contract, can contain a *quid pro quo*, or consideration, without containing the phrase "in exchange for."

Given their prevalence in SDNY plea agreements — and their inclusion in the plea agreement of every co-defendant who pleaded guilty in this case — it is impossible to believe that the Government would have offered Sessum a plea agreement without such provisions. Accordingly, there is nothing about these boilerplate provisions of the Plea Agreement that causes the Court any concern regarding the representation Sessum received throughout the plea process.

Further, the Plea Agreement correctly stated that the maximum term of imprisonment for both offenses in the S4 Indictment — wire fraud and conspiracy to commit wire fraud — is 40 years, not 20 years. Section 3584 expressly permits a court to order that the maximum term for each count (here, 20 years) run consecutively, rather than concurrently. *See* 18 U.S.C. § 3584(a). At his plea hearing, the Court explained to Sessum that his maximum sentencing exposure was 40 years. (Plea Tr. 15:15-16:9).[5]

The Plea Agreement also explicitly permitted Sessum to argue for a downward variance at sentencing. The Court recalls this sentencing proceeding vividly. Greenman argued forcefully and successfully on Sessum's behalf, and obtained a sentence substantially below the bottom of the Stipulated Guidelines Range. The Court appreciated the candor and the

---

[5] Sessum also claims that Greenman told him that he would get 20 years if convicted at trial. (*See* Sessum Aff. ¶ 4; Sessum Br. 6). However, Greenman's affidavit make clear that Sessum's allegation is false. Greenman states that he "never told Mr. Sessum that he would (b) likely get 20 or 40 years in jail. I did advise him that the government would argue that the Guideline calculation would be greater had we gone to trial." (Greenman Aff. ¶ 47). Further, at his plea hearing, Sessum made clear that he had spoken with Greenman about the Guidelines and the § 3553(a) factors that the Court would consider at sentencing. (Plea Tr. 19-20).

sensibleness of Greenman's arguments, and can confidently say that the degree of the downward variance was directly proportional to the strength of counsel's arguments.

Sessum's admissions during his plea proceeding make clear that it was his desire to plead guilty; that he had read and understood all provisions of the Plea Agreement; that he was satisfied with his counsel's representation; and that his guilty plea was knowing and voluntary. (*See generally* Plea Tr.). Greenman's affidavit further establishes that Sessum's plea was knowing and voluntary. Greenman details his extensive discussions with Sessum about a potential plea and states that it was ultimately Sessum who approached Greenman about pleading guilty. (Greenman Aff. ¶ 50). *See Riggi* v. *United States*, No. 04 Civ. 7852 (JSR), 2007 WL 2245595, at *1 (S.D.N.Y. Aug. 6, 2007) (denying a defendant's habeas petition without a hearing because the defendant's "affidavit's vague and self-serving allegations ... are contradicted by the detailed, specific affidavit of [the defendant's] counsel"). Greenman stated as much in open court on the record at Sessum's sentencing. (*See* Sent. Tr. 24:1-3 ("There was one thing I was about to file and Mr. Sessum came in and he surprisingly said to me 'I have to plead guilty.'")). Accordingly, Sessum has not shown that Greenman provided ineffective assistance of counsel in the plea negotiation process or in advising Sessum to plead guilty.

### 4. Sessum's Counsel Was Not Ineffective in Stipulating to a Loss Amount

Sessum's remaining argument is that his counsel provided ineffective assistance at sentencing by stipulating to a loss amount of $31 million.

(Sessum Br. 15). Sessum claims that this amount was inflated because not all of the debts were collected illegally. (*Id.*). Sessum's argument is premised on his belief that the loss amount he stipulated to in the Plea Agreement — between $25 million and $65 million — was significantly higher than the actual loss amount for his crimes, causing the Stipulated Guidelines Range to be inflated artificially. Sessum contends that if Greenman had reviewed certain documents, he would have learned that: (i) many of the debts that Sessum collected on were debts actually owed to Four Star; and (ii) numerous borrowers simply paid their debt without any communications from Sessum or his co-conspirators. (*Id.* at 16).

The Court rejects Sessum's first argument, that no victims suffered any losses because Sessum and his co-conspirators were collecting on actual, lawful debts owed by the victims to Four Star. "[W]hether or not any of the victims' payments made to [Sessum or Four Star] reflected debts legitimately owed, [Sessum's] use of fraudulent means to deprive those victims of 'potentially valuable economic information' that might otherwise have led them not to pay off those debts … rendered each payment part of the harm he inflicted by depriving the victims of the right to control their finances, and therefore a reasonable estimate of the victims' loss." *United States* v. *Williams*, 736 F. App'x 267, 273 (2d Cir. 2018) (summary order) (citing *United States* v. *Binday*, 804 F.3d 558, 570 (2d Cir. 2015)), *cert. denied*, 136 S. Ct. 2487 (2016). Sessum has admitted that he engaged in fraud to coerce his victims into paying debts. (Plea Tr. 28:2-16). Funds collected through fraudulent means, whether

lawfully owed or not, were properly included in Sessum's loss amount. For this reason, Greenman's failure to advance this argument does not fall below an objective standard of reasonableness.

Sessum's latter argument is that not all of the debts were collected through misrepresentations, inasmuch as some debtors paid their debts without having been called by Four Star. While this may be true, it does not paint the whole picture with respect to Sessum's loss amount, or to Greenman's advice for Sessum to plead guilty to a Plea Agreement stipulating to a loss amount of $25-65 million. Through his investigation, Greenman learned, among other things, that "witnesses would testify that Mr. Sessum was active in telling employees to illegally attempt to collect the debt" and that Sessum "had, from time to time, provided fraudulent scripts to a number of the employees." (Greenman Aff. ¶ 32). Greenman reviewed Sessum's and Thomas's emails, provided by the Government during discovery and was advised by numerous individuals that Sessum had instructed a number of debt collectors to use false and fraudulent means to collect the debts. (*Id.* at ¶¶ 18, 19). Further, Greenman was advised that various inculpatory documentation was found in Sessum's office or was located inside his desk, including one or more unlawful scripts. (*Id.* at ¶ 20).

Greenman also explains that the Government took a rigid position with regard to plea negotiations. (Greenman Aff. ¶ 23). The Government argued that, at trial, the loss amount could actually be significantly greater than the $31 million referred to in the S4 Indictment. (*Id.* at ¶ 27). That was because

the Government told counsel that it would argue at sentencing that every phone call made by any collector, even where money was not collected, could be utilized in the loss amount as "intended loss." (*Id.*).  Further, the Government told counsel that if Sessum was to be convicted after a trial, it would recommend to the Court that the sophisticated means enhancement, misrepresentation of government affiliation enhancement, and other enhancements, should be applied to Sessum's Guidelines calculation.  (*Id.*). *See* U.S.S.G. § 2B1.1(b)(9) (setting forth two-level enhancement for misrepresentation that defendant is acting on behalf of a government agency), § 2B1.1(b)(10) (setting forth two-level enhancement for sophisticated means).

Greenman also explains that the Government's position was that the illegality in collecting debts was so pervasive that Sessum and Thomas should be held liable for the entire amount of money collected.  (Greenman Aff. ¶ 51). Greenman states that "[he] knew it would be difficult to defeat the government's position of pervasiveness in the collection process." (*Id.*).  Had Sessum gone to trial, there would have been abundant victim evidence presented to the Court, from which it could determine the loss amount.  (*Id.*). Faced with this information, it was eminently reasonable for Greenman to advise Sessum to plead guilty pursuant to a Plea Agreement containing a $25-65 million loss figure.[6]

---

[6]     Each of Sessum's arguments about ineffectiveness at sentencing also overlooks the fact that the Court granted a substantial downward variance, in part to account for the fact that a certain percentage of the debts collected were in fact legitimately owed — a downward variance directly attributable to Greenman's sentencing arguments.

## CONCLUSION

Sessum's motion under 28 U.S.C. § 2255 is DENIED. Because it is plain from Sessum's papers that he is not entitled to relief under § 2255, his motion to expand the record is also denied.

A certificate of appealability shall be not granted, because Sessum has not made a substantial showing of a denial of a federal right and appellate review is, therefore, not warranted. *Hoffler* v. *Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff* v. *Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998).

The Clerk of Court is directed to docket this Opinion and Order in case numbers 18 Civ. 6222 and 15 Cr. 667. The Clerk of Court is further directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     March 16, 2020
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge


*Sent by First Class Mail to:*
Maurice Sessum
Reg. No. 24456-055
Lewisburg Federal Prison Camp
P.O. Box 2000
Lewisburg, PA 17837